**Opinion filed May 15, 2014**



## In The

# Eleventh Court of Appeals

_____

## No. 11-12-00269-CV

_____

## CYNTHIA L. CLACK, Appellant

## V.

## LARRY WOLLSCHLAGER, Appellee

**On Appeal from the 318th District Court**
**Midland County, Texas**
**Trial Court Cause No. FM-47,213**

## M E M O R A N D U M   O P I N I O N

We withdraw our former opinion and judgment dated December 19, 2013, and substitute this opinion and judgment therefor. The motion for rehearing filed by Cynthia L. Clack is denied.

Judge Les Hatch entered an order for Cynthia L. Clack, an attorney, to pay $17,670, as a Rule 13 sanction,[1] for her conduct in the underlying lawsuit.[2] Clack contends that Judge Hatch—who heard the sanctions motion, entered the order, and imposed the sanction—abused his discretion. Judge Hatch found Clack's allegations of "trickery" by Judge Dean Rucker, the trial judge in the underlying custody case, and "collusion" between Judge Rucker and opposing counsel, David R. McClure, were groundless and brought in bad faith. We affirm.

## I. *Background Facts*

### A. *The Underlying Case*

Clack represented Kimberly Low Carlson in a contested child custody case between Carlson and her ex-husband, Larry Wollschlager.[3] McClure represented Wollschlager. Carlson and Wollschlager's child suffers from a condition that requires continuous medical care, and given those special health needs, the parental rights and duties, including financial obligations, were vigorously contested.

Following a mediated settlement, Judge Rucker signed an agreed order. Judge Rucker appointed Wollschlager and Carlson as joint managing conservators of the child; restricted the child's residence to Midland County, Texas; and gave each parent the exclusive right to designate the child's primary residence within Midland County during his or her periods of possession.

Subsequently, Carlson moved to modify the order and sought to be designated sole managing conservator of the child with no geographic restriction on his place of residence. She also moved to make Wollschlager fully responsible

---

[1]TEX. R. CIV. P. 13.

[2]Claudia Donaldson also represented Kimberly Low Carlson in the underlying lawsuit. Judge Hatch ordered Donaldson, jointly and severally with Clack, to pay the $17,670 fine, but Donaldson did not appeal Judge Hatch's order that imposed Rule 13 sanctions.

[3]Donaldson also represented Carlson and was listed on the pleadings.

for the child's medical expenses.  Wollschlager countersued, seeking to be designated as joint managing conservator with the exclusive right to designate the child's primary residence.  Carlson requested a jury trial, and the case was placed on the jury docket.

Two weeks before trial, Wollschlager moved to strike the case from the jury docket on grounds that Carlson, in an attempt to taint the jury pool, posted a website that broadcast her view of the child's medical condition.  The website contained videos that Wollschlager intended to offer as exhibits.  On the website, Carlson solicited donations for the child's health care and Carlson's legal expenses.  The trial court instructed Carlson to take the website down, but the trial court denied Wollschlager's motion to strike the case from the jury docket.

When the trial concluded, Judge Rucker submitted a charge to the jury in which it was asked whether the joint managing conservator should be replaced with a sole managing conservator and, if "yes," who should be named sole managing conservator.  Next in the charge, Judge Rucker asked the jury, on condition that it answered "No" to the question of whether there should be a sole managing conservator:

(1)    whether the joint managing conservatorship should be modified so that one parent has the exclusive right to determine the child's primary residence;

(2)    who that parent should be;

(3)    whether that parent's right should be limited by a geographic restriction; and

(4)    what the geographic restriction should be if the jury chose to impose one.

A supplemental charge instructed the jury that the sole managing conservator's rights would be subject to any limitation imposed by the trial court if it found that

3

the limitation would be in the best interest of the child. Carlson did not object to the submitted charge, and neither Carlson's proposed charge nor the charge submitted to the jury addressed whether a geographic restriction should be imposed on a sole managing conservator's right to determine the primary residence of the child.

After deliberations, the jury found that the previous appointment of joint managing conservators should be replaced with the appointment of a sole managing conservator and named Carlson as the parent who should be appointed as sole managing conservator. Because the jury answered "Yes" to the question regarding replacement of the joint managing conservators with a sole managing conservator, it reached none of the remaining questions related to a joint managing conservator's right to determine the child's primary residence.

Through her attorneys, Carlson moved for entry of a final order and asked the trial court to provide written instructions and orders or to schedule a hearing to address the issues remaining before the court, including support, possession and access, and any special orders regarding the child's medical care. Wollschlager's counsel also requested a hearing on nonjury issues and asked the trial court, among other requests, to designate Midland County as the child's county of residence. After the hearing, Judge Rucker requested that the parties provide additional briefing. Wollschlager's counsel sent a letter brief to Judge Rucker and Clack that included arguments and case law in support of a geographic restriction. Clack, on behalf of Carlson, responded to Wollschlager's contentions with a letter brief of her own.

After Judge Rucker heard evidence regarding the outstanding nonjury issues, he issued a letter ruling in which he restricted Carlson's exclusive right to designate the child's primary residence to Midland County and contiguous counties. Judge Rucker also ordered that Wollschlager pay 100% of the child's

health care expenses. Judge Rucker outlined in his letter that he had examined the Texas Family Code and relevant case law on sole managing conservators and jury trials. Judge Rucker concluded that the Family Code expressly authorizes courts to impose limitations on the sole managing conservator's exclusive rights, including a geographic restriction on the right to determine the child's residence.

In response to Judge Rucker's ruling, Clack prepared, signed, and filed a motion for judgment to conform to the jury verdict. The motion contained the following:

> [Carlson] very respectfully disagrees that a geographic restriction is called for under the facts of this case. However, the fact that the Court prepared a *charge* that gave the jury a question on geographic restriction to answer <u>only</u> should they bypass Question 1 on *Sole Managing Conservator* and <u>only</u> if they went to the Question on *Joint Managing Conservator*, is an erroneous application of the law, giving special treatment to someone who does not reasonably need it.

Clack attached the following footnote to the sentence related to the jury charge: "Further, this rises to the level of trickery on the part of the Court and smacks of collusion between counsel for Larry Wollschlager and the Court." Thereafter, Judge Rucker notified the lawyers for Wollschlager and Carlson that the case merited further consideration, and he withdrew his letter ruling.

Wollschlager's attorney, McClure, who was embarrassed and angry about Clack and Donaldson's allegations, moved for sanctions under Rule 13 of the Texas Rules of Civil Procedure. At the hearing on sanctions, McClure testified that he did so because:

> I'd been accused of doing an unethical act—I'd been accused of committing a crime. Judge Rucker had been accused of [a] violation of the Code of Judicial Conduct.

5

. . . I'd never had anything happen like that to me before, and I was really angry, that I didn't [want to] let something like that to happen again. And I wanted to bring it to the attention of the Court.

Because Judge Rucker was the Presiding Judge of the Seventh Administrative Judicial Region, he requested that the Texas Supreme Court appoint a judge to conduct the hearing on McClure's motion.

### B. The Sanctions Hearing

The Texas Supreme Court assigned Judge Hatch to conduct the hearing on the motion for sanctions. Clack, Donaldson, Carlson, Wollschlager, and McClure each testified to their knowledge of the circumstances surrounding the allegations. Another witness, Nancy Jones, Wollschlager's former office manager who had recently been fired, also testified.[4] Clack relied on the following evidence, viewed as a whole, to support her allegations of trickery and collusion:

(1)  McClure and Judge Rucker sat next to each other at a dinner for family law specialists while this case was on the docket;

(2)  McClure, two weeks before trial, moved to strike the case from the jury docket on grounds that Clack found implausible;

(3)  McClure was frequently seen in the hallway to Judge Rucker's office during trial and had the judge's secretary handle a personal request;

(4)  Judge Rucker appeared to know that McClure was going to request a trial amendment after the close of evidence before McClure had done so;

---

[4]Wollschlager testified that Jones was terminated for several reasons. First, Jones had given herself an $11 raise in the electronic payroll system without authorization. Second, Jones had placed her daughter on electronic payroll, without authorization, and had the company pay her daughter more than $18,000 after her daughter no longer worked at the company. Finally, Jones had opened mail and taken Southwest Airlines rewards tickets that belonged to Wollschlager and used them to fly, with her husband, to Baltimore, Maryland.

6

(5)    Clack saw McClure and Judge Rucker sitting next to each other at a private dinner with a small group while Clack's post-verdict motion was pending;

(6)    Wollschlager paid for 100% of the child's orthotics six days before the court ruled that Wollschlager would be fully responsible for such expenses, although he had never paid more than 50% in the past; and

(7)    Carlson received a text message from Wollschlager's former employee, Jones, that successfully predicted when the court would rule and said that Judge Rucker and McClure were "up to something."

Donaldson testified that she and Clack did not make their allegations in bad faith; rather, their view of the high degree of "familiarity" and "extrajudicial conduct" between McClure and Judge Rucker led to their suspicion of special treatment, trickery, and collusion in imposing the geographic restriction.

Carlson briefly testified to Wollschlager's payment for the child's orthotics. Carlson said that Wollschlager's offer to pay 100% of the bill for the orthotics struck her as unusual because that was the third set of orthotics for the child and Wollschlager had never paid more than 50% of the bills in the past.

Wollschlager testified that he paid for the child's new orthotics out of generosity because Wollschlager had suggested that the child receive the treatment and he knew it would cost more money. Wollschlager testified that McClure had never indicated he had any special relationship with Judge Rucker, and McClure had told Wollschlager he did not know how Judge Rucker would rule.

McClure testified that he and Judge Rucker did not engage in any improper conduct and that he was shocked and embarrassed by Clack's allegations. McClure countered Clack's testimony with the following:

(1)    McClure sat at the same table as Judge Rucker, along with eight to ten other family law specialists, at the annual banquet during a seminar for family law specialists, but McClure did not discuss the pending

case at the dinner and did not treat Judge Rucker any differently than anyone else at the table;

(2) McClure had frequently gone into the hallway to Judge Rucker's office to get coffee and had seen other lawyers do the same, and McClure never went into Judge Rucker's private chambers to meet with him alone about the case;

(3) Based on how the evidence had played out, everyone assumed that McClure had pleaded to have Wollschlager appointed sole managing conservator, but he had not; therefore, he asked for leave to amend the pleadings to reflect the request;

(4) McClure had dinner with Judge Rucker and Judge Cutter on a separate occasion, along with a group of eight to ten lawyers who frequently plan dinners together, but McClure did not make the reservations and never discussed the pending case with Judge Rucker that evening; and

(5) McClure did not know that a ruling was coming or what the ruling would be when Clack received the text message from Wollschlager's former employee, Jones.

After hearing the evidence, Judge Hatch awarded Wollschlager sanctions in an amount less than his attorney's fees and costs in the prosecution of the motion for sanctions. The court ordered that Clack and Donaldson were jointly and severally liable for the sanctions.

## II. *Issue Presented*

Did the trial court abuse its discretion when it imposed sanctions against Clack after finding her allegations of trickery by Judge Rucker and collusion between Judge Rucker and McClure were groundless and brought in bad faith?

## III. *Standard of Review*

We review a trial court's order that imposed Rule 13 sanctions under an abuse of discretion standard. *Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581,

583 (Tex. 2006). The ruling will be reversed only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). "The degree of discretion afforded by the trial court is . . . greater when sanctions are imposed for groundless pleadings than when imposed for discovery abuse." *Nath v. Tex. Children's Hosp.*, 375 S.W.3d 403, 409 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) (alteration in original) (quoting *Falk & Mayfield L.L.P. v. Molzan*, 974 S.W.2d 821, 827 (Tex. App.—Houston [14th Dist.] 1998, pet. denied)).

Under an abuse of discretion standard, the trial court assesses the credibility of the witnesses and may resolve conflicting testimony. *See Keever v. Finlan*, 988 S.W.2d 300, 311, 313–14 (Tex. App.—Dallas 1999, pet. dism'd). In reviewing an order that imposed sanctions, we are not bound by a trial court's findings of fact and conclusions of law; rather, we must independently review the entire record to determine whether the trial court abused its discretion. *State Office of Risk Mgmt. v. Foutz*, 279 S.W.3d 826, 830 (Tex. App.—Eastland 2009, no pet.). Any conflicting evidence is viewed in the light most favorable to the trial court's ruling, and all reasonable inferences in favor of that ruling will be drawn. *Id.*

There is no abuse of discretion if some evidence of substantive and probative character supports the trial court's decision or if the evidence is conflicting. *Harrison v. Harrison*, 363 S.W.3d 859, 862–63 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Foutz*, 279 S.W.3d at 830. A trial court abuses its discretion if the sanctions imposed are not appropriate and just. *Am. Flood Research*, 192 S.W.3d at 583.

### IV. *Analysis*

Rule 10.001 of the Texas Civil Practice and Remedies Code provides that, when lawyers sign a pleading or motion, they certify, to their "*best knowledge,*

9

*information and belief*, formed after *reasonable inquiry*," that "*each allegation* or other *factual contention* in the pleading or motion *has evidentiary support*." TEX. CIV. PRAC. & REM. CODE ANN. § 10.001(3) (West 2002) (emphasis added). Likewise, Rule 13 provides that lawyers who sign pleadings or motions certify that they "have read the pleading, motion, or other paper; that to the best of *their knowledge, information, and belief* formed after *reasonable inquiry* the instrument is *not groundless* and *brought in bad faith*." TEX. R. CIV. P. 13 (emphasis added). "Consequently, [a lawyer who signs] a pleading or motion certifies that *each* claim, *each* allegation, and *each* denial is based upon the signatory's best knowledge, information, and belief, formed after reasonable inquiry." *Foutz*, 279 S.W.3d at 831 (citing *Low v. Henry*, 221 S.W.3d 609, 615 (Tex. 2007)).

Courts must presume that pleadings are filed in good faith, and the party moving for sanctions must overcome this presumption. *See GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 730–31 (Tex. 1993). Rule 13 authorizes a trial court to impose sanctions against an attorney for filing a pleading that is groundless and brought in bad faith or for harassment. *See* TEX. R. CIV. P. 13. "Rule 13 identifies (a) the conduct punishable—filing any fictitious pleading or making statements that are groundless, false, or for purposes of delay; (b) who may be sanctioned—the person who signed the pleading, a represented party, or both; and (c) the amount of possible sanctions—any sanctions available under Texas Rule of Civil Procedure 215." *Nath*, 375 S.W.3d at 414 (citing TEX. R. CIV. P. 13). "In turn, Rule 215.2(b) provides that a court may order as sanctions 'reasonable expenses, including attorney fees.' Tex. R. Civ. P. 215.2(b)(8)." *Nath*, 375 S.W.3d at 414. Because Wollschlager did not allege, and Judge Hatch did not find, that Clack's allegations were for the purpose of harassment, we limit our review to whether the motion was groundless and brought in bad faith. *See GTE Commc'ns*, 856 S.W.2d at 731.

### A. Whether Clack's Allegations Were Groundless

"The purpose of Rule 13 is to check abuses in the pleading process, i.e., to [e]nsure that at the time the challenged pleading was filed the litigant's position was factually well-grounded and legally tenable." *Dalziel v. Dalziel*, No. 03-98-00059-CV, 1998 WL 765107, at *2 (Tex. App.—Austin Oct. 29, 1998, no pet.) (not designated for publication) (citing *Home Owners Funding Corp. of Am. v. Scheppler*, 815 S.W.2d 884, 889 (Tex. App.—Corpus Christi 1991, no writ)). "Groundless" means "no basis in law or in fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." *Great W. Drilling, Ltd. v. Alexander*, 305 S.W.3d 688, 697 (Tex. App.—Eastland 2009, no pet.). The trial court uses an objective standard to determine whether a pleading is groundless and asks whether the party and counsel made a reasonable inquiry into the legal and factual basis of the claim. *Id.* at 697–98.

Reasonable inquiry means the amount of examination that is reasonable under the circumstances of the case. *Robson v. Gilbreath*, 267 S.W.3d 401, 406 (Tex. App.—Austin 2008, pet. denied) (citing *Monroe v. Grider*, 884 S.W.2d 811, 817 (Tex. App.—Dallas 1994, writ denied)). We review reasonable inquiry by looking at the facts available to the attorney and the circumstances that existed when the attorney signed and filed the pleading or motion. *Robson*, 267 S.W.3d at 405; *Elkins v. Stotts-Brown*, 103 S.W.3d 664, 668–69 (Tex. App.—Dallas 2003, no pet.); *McCain v. NME Hosps., Inc.*, 856 S.W.2d 751, 757 (Tex. App.—Dallas 1993, no writ).

Clack asserted in her brief and her motion for rehearing that we should consider information learned after she filed the motion on November 4, 2011. But the trial court must examine the credibility of the party or attorney against whom sanctions are requested, taking into consideration all facts and circumstances available at the time of the filing. *Robson*, 267 S.W.3d at 405; *Elkins*, 103 S.W.3d

at 668–69; *McCain*, 856 S.W.2d at 757; *Home Owners*, 815 S.W.2d at 889. In light of this standard, we will look at what the record showed Clack had discovered and knew as of November 4, 2011.

Clack asserted that Judge Rucker "tricked" her and "colluded" with McClure on whether a geographic restriction would be imposed following the jury's verdict. In her motion, following Judge Rucker's letter ruling that dealt, in part, with the geographic restriction, Clack wrote in a footnote, "Further, this rises to the level of *trickery* on the part of the Court and smacks of *collusion* between counsel for Larry Wollschlager and the Court" (emphasis added).

"Trickery" is defined as "the practice of crafty underhanded ingenuity to deceive or cheat." WEBSTER'S NEW COLLEGIATE DICTIONARY 1336 (11th ed. 2004). "Smack" means "to have a trace, vestige, or suggestion." *Id.* at 1176. "Vestige" means "a trace, mark, or visible sign left by something . . . vanished or lost." *Id.* at 1392. "Suggestion" is defined as "[a]n indirect presentation of an idea" or "[a] statement of some fact or circumstance that will materially affect the further proceedings in the case." BLACK'S LAW DICTIONARY 1571 (9th ed. 2009). "Collude" is defined as "to collaborate in wrongdoing." BRYAN GARNER, A DICTIONARY OF MODERN LEGAL USAGE 172 (2d ed. 1995). "Collusion" is defined as "[a]n agreement to defraud another or to do or obtain something forbidden by law." BLACK'S LAW DICTIONARY 300 (9th ed. 2009). "Collusion" also is more particularly defined as "an agreement between two or more persons to defraud another." GARNER at 172; *see also Standard Sav. & Loan Ass'n v. Fitts*, 39 S.W.2d 25, 26 (Tex. 1931). Thus, in essence, Clack's allegation was a statement of fact or circumstance that McClure and Judge Rucker had collaborated, in a crafty and underhanded way, to deceive or cheat in order to get something for McClure's client that was forbidden by law. The law presumes Clack and Donaldson's allegations were made with evidentiary support, grounded in law and

12

fact, garnered from reasonable inquiry. We now review what evidence was adduced to rebut that presumption.

Clack alleged that she was "tricked" out of requesting a jury instruction on whether the jury could determine whether to restrict one of the duties of a sole managing conservator and impose a geographic restriction on the child's residence. But Judge Rucker would have erred if he had included such a request in the charge because the plain language of the Family Code prohibits a jury from deciding duties of a conservator and determining whether to place a geographic restriction on a sole managing conservator's right to designate the primary residence of the child under TEX. FAM. CODE ANN. § 105.002(c) (West 2014). Instead, a jury may only place a geographic restriction on the right of a joint managing conservator to designate the primary residence of the child. FAM. § 105.002(c); *Messier v. Messier*, 389 S.W.3d 904, 915 n.3 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Section 153.132 of the Texas Family Code further outlines that the trial court has the discretion to limit the duties of a sole managing conservator when it is in the child's best interest. *See* FAM. § 153.132; *In re Reiter*, 404 S.W.3d 607, 610–11 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *In re S.M.D.*, 329 S.W.3d 8, 22 (Tex. App.—San Antonio 2010, pet. dism'd); *In re A.S.*, 298 S.W.3d 834, 835–36 (Tex. App.—Amarillo 2009, no pet.); *Sanchez v. Sanchez*, No. 04–06–00469–CV, 2007 WL 1888343, at *3 (Tex. App.—San Antonio July 3, 2007, pet. denied).

In June 2011, McClure sent a letter to Clack that discussed the issue of geographic restriction. He also presented a trial brief where he referred to the relevant portions of the Family Code and analyzed their application to the jury instruction at issue in this case. Donaldson acknowledged she was aware of the residency restriction request in June. Clack made no argument against McClure's analysis at trial, never requested the instruction of which she complains, and also

failed to object to the charge that Judge Rucker gave to the jury. In her motion, Clack argued that a jury instruction on the geographic restriction, for a sole managing conservator, was permissible, but it is not. FAM. § 105.002(c)(2)(C). Clack never argued for a change to Section 105.002(c)(2)(C). After trial, McClure filed a request in early August for the court to impose a geographic restriction and decide other nonjury issues. A hearing was held later in August on these issues. In September, at Judge Rucker's request, McClure filed a letter brief, as did Clack, on the nonjury issues, including the geographic restriction. Thus, Clack was aware of McClure's position and arguments well before she signed her November motion alleging trickery and collusion.

Donaldson testified that her view of trickery and collusion was based on the affidavits from Clack and Carlson, but those affidavits did not outline any unethical conduct by McClure or Judge Rucker. Clack and Donaldson testified that they thought that Judge Rucker and McClure had a high degree of "familiarity," as Clack had outlined in her affidavit, and they felt that certain events, based on the "totality of the circumstances," demonstrated trickery and collusion.

Clack asserted that McClure's motion to strike the case from the jury docket evinced collusion because Judge Rucker instructed Carlson to take down her website that detailed her child's medical condition and her request for assistance on legal fees. But McClure explained that he filed the motion because he viewed Carlson's website, which was put up prior to trial, as an improper attempt to taint the jury pool. And, although Judge Rucker instructed Carlson to take down the website, he denied McClure's motion.

Clack also asserted that McClure's other motions, trial amendments, requests, and letters were evidence of collusion. But none of McClure's actions contravened any procedural rules, and Donaldson agreed that lawyers can send

14

letters to judges as long as all counsel receive copies. In addition, motions and arguments of counsel are not evidence. *Delgado v. Kitzman*, 793 S.W.2d 332, 333 (Tex. App.—Houston [1st Dist.] 1990, no writ).

Clack testified that she drew adverse inferences from seeing McClure, along with several other attorneys, at two dinners in which Judge Rucker was present. One dinner, in August 2010, was part of a family law specialists' CLE seminar. The second dinner, which occurred the following year, was private but occurred at the same time as another family law CLE seminar. Clack said McClure's and Rucker's presence together at the two dinners demonstrated collusion even though she acknowledged that it is not inappropriate for judges to attend dinners with lawyers and that her father and stepmother, who were judges, had attended similar functions. McClure testified that both dinners were in conjunction with family law CLE seminars and that Judge Cutter attended the second dinner, which was arranged by someone other than McClure. McClure also testified that he and Judge Rucker did not talk about the pending proceedings at either dinner or at any other time outside of the court's official proceedings. When questioned about her inquiry into the facts before filing her motion, Clack never said she interviewed anyone that attended the dinners, including Judge Cutter.

Clack testified she had suspicions about McClure and Judge Rucker because McClure got coffee from the break room in the hallway behind the court coordinator's area, during trial breaks, and because Judge Rucker's court coordinator, Ana O'Bryant, had printed some documents for McClure during a trial break. McClure explained that courthouse custom allowed lawyers to get coffee from the break room and that he never went into Judge Rucker's chambers at any time and never spoke to him ex parte about the case. McClure also said that he had forgotten to print some documents and that Judge Rucker had permitted him to have O'Bryant print them. Clack also testified that McClure had only been seen in

the hallway and that, at Judge Rucker's insistence, she too had received assistance from O'Bryant during a trial break. When asked about her investigation, Clack never said that she had interviewed O'Bryant about her suspicions concerning McClure.

Clack testified that Wollschlager's voter registration and his payment of 100% of the cost for his son's orthotics demonstrated trickery and collusion. Wollschlager testified that he lived in Midland but had his voter registration in Loving County where he had wells; he said he wanted to vote for public officials who would listen to his concerns. Wollschlager testified the medical payments for his son were generous gestures that were made because the procedures that he had requested cost more money.

Clack asserted that the text that Carlson received from Wollschlager's former office manager, Nancy Jones, about a week before a ruling by Judge Rucker, demonstrated trickery and collusion. Although Clack put great weight on Jones's text, when asked if she had talked to Jones, Clack said she had spoken to Donaldson, who said she had spoken to Jones[5] about the text that alleged McClure and Judge Rucker were "up to something."[6] Jones testified that McClure had said he was friends with Judge Rucker, but she never testified that she had ever met or spoken to Judge Rucker or that McClure and Judge Rucker had any type of improper or unethical relationship. McClure testified that he thought they had a strong case and that he had known Judge Rucker for twenty years, but it was his

---

[5]Clack argues in her motion for rehearing that she spoke to Jones and her lawyer, but a review of the record reflects that it was Donaldson who spoke to Jones and her lawyer, Ms. Williams. Donaldson testified that Jones "supposedly" knew something about Judge Rucker, but Donaldson never explained what information she received from Jones or her lawyer that implicated McClure or Judge Rucker in improper or unethical conduct.

[6]Donaldson never explained what information she received from Jones.

16

father, who had been represented by Judge Rucker's father, that had the relationship.

Clack claims her allegations were not limited to Judge Rucker's preparation of the jury charge but also applied to his imposition of a geographic restriction on the child's residence, which he later rescinded. But regardless of whether the allegations referred to the geographic restriction itself or were limited to the absence of a jury instruction, McClure provided an explanation for the events that Clack asserted were suspicious "extrajudicial" conduct. Clack testified that she thought she had evidence to suggest an appearance of impropriety between Judge Rucker and McClure but not enough evidence to file a grievance against them; however, Donaldson admitted that they made serious allegations of unethical conduct against both Judge Rucker and McClure.

McClure denied that he ever spoke to Judge Rucker about this case outside the presence of counsel. Judge Hatch found that Clack's assertions of "extrajudicial conduct" did not constitute a factual basis for her accusations of trickery and collusion because she was well aware of Wollschlager's position to request the court to restrict the child's residence. According to Judge Hatch, neither Judge Rucker's consideration nor his ruling on the geographic residence restriction for the child, taken alone or in conjunction with Clack's allegations of extrajudicial conduct, provided a factual basis for Clack's allegations of trickery and collusion.

Judge Hatch, in his order, found Clack's allegations to be "groundless" because (1) Clack neither requested the jury question she complains of nor objected to the charge given to the jury and (2) the Family Code prohibits a jury from deciding whether to impose a geographic restriction on a sole managing conservator's right to designate the child's residence. Judge Hatch found Clack's allegations were advanced without reasonable inquiry before she filed her motion.

17

After reviewing the record and all of the information available to Clack at the time she signed her motion, there was some evidence of substantive and probative character to support Judge Hatch's decision. Therefore, we cannot say that Judge Hatch acted arbitrarily or unreasonably and abused his discretion when he found that her allegations of trickery and collusion were "groundless."

### B. Whether Clack Acted in Bad Faith

Courts must presume that pleadings are filed in good faith, and the party moving for sanctions must overcome this presumption. *GTE Commc'ns*, 856 S.W.2d at 730–31. "Bad faith" is not simply bad judgment or negligence but is, rather, the conscious doing of wrong for dishonest, discriminatory, or malicious purpose. *Great W. Drilling*, 305 S.W.3d at 698 (citing *Armstrong v. Collin Cnty. Bail Bond Bd.*, 233 S.W.3d 57, 63 (Tex. App.—Dallas 2007, no pet.)). Under Rule 13, "bad faith" requires the conscious doing of a wrong for a dishonest, discriminatory, or malicious purpose. *Great W. Drilling*, 305 S.W.3d at 698; *Save Our Springs Alliance, Inc. v. Lazy Nine Mun. Util. Dist. ex rel. Bd. of Directors*, 198 S.W.3d 300, 321 (Tex. App.—Texarkana 2006, pet. denied) (citing *Stites v. Gillum*, 872 S.W.2d 786, 794–96 (Tex. App.—Fort Worth 1994, writ denied)).

Improper motive is an essential element of bad faith. *Dike v. Peltier Chevrolet, Inc.*, 343 S.W.3d 179, 193 (Tex. App.—Texarkana 2011, no pet.); *Robson*, 267 S.W.3d at 407. While we presume pleadings are filed in good faith, direct evidence of a sanctioned person's subjective intent is not required to rebut the presumption. *Keith v. Solls*, 256 S.W.3d 912, 919 (Tex. App.—Dallas 2008, no pet.). Intent may be shown by circumstantial evidence as well as direct evidence. *Id.* (citing *Smith v. Jungkind*, 252 S.W.2d 596, 599 (Tex. Civ. App.—Austin 1952, writ ref'd)).

Clack argues that the evidence concerning a lack of reasonable inquiry cannot also be used to support the second prong of Rule 13 of acting in bad faith.

18

We disagree. A party acts in bad faith, under Rule 13, if she has been put on notice that her claim may be groundless and she does not make reasonable inquiry before pursuing the claim further. *Elwell v. Mayfield*, No. 10-04-00322-CV, 2005 WL 1907126, at *6 (Tex. App.—Waco Aug. 10, 2005, pet. denied) (mem. op.) (citing *Elkins*, 103 S.W.3d at 668–69). As we have explained above, Clack had prior notice of the arguments advanced by McClure and had the opportunity to make a reasonable inquiry about her suspicions, but failed to do so; those facts implied a dishonest or improper motive. Clack cannot eschew reasonable investigation of her suspicions and then claim that her lack of knowledge prevents the imposition of Rule 13 sanctions when her accusations are groundless. *See Monroe*, 884 S.W.2d at 819.

Clack stated that the high degree of "familiarity" and "extrajudicial conduct" between McClure and Judge Rucker supported claims of trickery and collusion. Clack stated in her response to McClure's motion for sanctions that McClure had been seen exiting Judge Rucker's chambers one or more times during the underlying trial. If true, Clack alleged ex parte communication between McClure and Judge Rucker in chambers that would be unethical conduct sure to cast doubt on and question the fairness of the trial proceedings as well as implicate McClure in a criminal offense.[7] Donaldson testified that their allegations were serious and that they had alleged unethical conduct.[8]

Canon 2(B) of the Canons of Judicial Conduct provides, in part, that "[a] judge shall not allow any relationship to influence judicial conduct or judgment." TEX. CODE JUD. CONDUCT, Canon 2(B), *reprinted* in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. B (West 2013). Canon 3(8) of the Canons of Judicial Conduct

---

[7]TEX. PENAL CODE ANN. § 36.04 (West 2011).

[8]It is undisputed that neither Donaldson nor Clack reported any unethical conduct by McClure or Judge Rucker to anyone.

19

provides that a judge shall not initiate, permit, or consider ex parte communications made to him concerning the merits of a pending judicial proceeding. *Id.* Canon 3(8). Furthermore, Canon 3(9) provides that "[a] judge should dispose of all judicial matters promptly, efficiently and fairly."

Rule 3.05(b) of the Texas Disciplinary Rules of Professional Conduct provides that a lawyer shall not communicate ex parte with a tribunal for the purpose of influencing that entity concerning a pending matter. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.05(b), *reprinted* in TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A (West 2013) (TEXAS STATE BAR R. art. X, § 9).[9] Rule 8.04 provides, in part, that a lawyer shall not violate the rules or knowingly assist another to do so; engage in dishonest, fraudulent, or deceitful conduct; obstruct justice; state or imply the ability to improperly influence an official; or knowingly assist a judge in conduct that violates applicable rules of judicial conduct or other law. *Id.* R. 8.04(a)(1), (3), (4), (5), (6).

Clack stated that she was merely suspicious of "extrajudicial conduct," but a comment to Rule 8.03 provides that "a lawyer *should not fail to report* an *apparent disciplinary violation* merely because he cannot *determine its existence or scope* with *absolute certainty*." *Id.* R. 8.03 cmt. 1 (emphasis added). "Reporting a violation is especially important where the victim is unlikely to discover the offense." *Id.*

In such a situation, Rule 8.03 comments outline that, in deciding to report possible violations, it is not the "quantum of evidence" that lends support to the "substantial question" as to the lawyer's "honesty [or] trustworthiness" that is determinative, but the "seriousness of the possible [misconduct]." *Id.* R. 8.03(a),

---

[9]Rule 3.05(b) outlines that communications in the course of proceedings are permissible as are written communications provided a copy is sent to opposing counsel or parties. And, with adequate notice to opposing counsel, oral communications are permitted. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.05(b).

(b), & cmt. 2. But Clack did not report anything, and Clack's own affidavit did not state that anyone had actually seen McClure exit Judge Rucker's chambers. Clack and Donaldson admitted that McClure had only been seen in the hallway next to the break room, and McClure explained that he, like other lawyers, was getting coffee from a break room. Furthermore, McClure denied ever going into Judge Rucker's chambers or speaking with him ex parte about the case.

Clack argues that she did not initiate formal grievance procedures because she had no actual knowledge that any disciplinary rules had been violated. Clack's statement evinced an understanding that ethical violations are to be dealt with as part of the grievance procedure established for dealing with unethical conduct. *See id.* R. 8.02; *see also Dalziel*, 1998 WL 765107, at *2; *House v. State*, 947 S.W.2d 251, 252–53 (Tex. Crim. App. 1997); *Pannell v. State*, 666 S.W.2d 96, 98 (Tex. Crim. App. 1984). Clack also understood a lawyer has a duty under Rule 3.01 of the Texas Disciplinary Rules of Professional Conduct not to assert an issue unless the lawyer reasonably believes that there is a basis for doing so that is not frivolous. TEX. DISCIPLINARY RULES PROF'L CONDUCT R. 3.01.

But Donaldson testified that they made serious allegations of unethical conduct by McClure and Judge Rucker. Clack said she had spoken to Donaldson, but if Clack had reticence about reporting a possible violation, then she would know that Rule 8.02(a) provides, "A lawyer *shall not* make a statement that the lawyer knows to be false or *with reckless disregard as to its truth or falsity*" concerning the "*integrity of a judge, adjudicatory official or public legal officer.*" *Id.* R. 8.02 (emphasis added). Because McClure denied ever being in Judge Rucker's chambers and denied engaging in ex parte communications and because no one ever testified that they had seen McClure do either, Clack and Donaldson's allegations were made with reckless disregard and were false.

Clack asserts that she engaged in permissible advocacy justified by her suspicions of "extrajudicial" conduct. But, as the comments in Rule 8.02 explain, "false statements by a lawyer can undermine public confidence in the administration of justice." *Id.* R. 8.02 cmt. 1. Clack could have moved for judgment to conform to the jury verdict without making accusations that Judge Rucker and McClure had engaged in collusion and trickery. Instead, Clack ignored McClure's prior pleadings; the evidence and arguments advanced by him before, during, and after trial; and the existing law on the issues. She also failed to investigate her suspicions and apprise McClure or Judge Rucker of her concerns before including them in her motion. Clack further chose to forgo appropriate grievance procedures and, instead, without evidentiary support, inserted in a footnote serious allegations that McClure and Judge Rucker had engaged in unethical conduct. In Judge Hatch's words, the allegations were groundless, gratuitous, and brought in bad faith. *See Meek v. Bishop Peterson & Sharp, P.C.*, 919 S.W.2d 805, 809–10 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (upholding Rule 13 sanction order against attorneys who made gratuitous allegation of improper conduct in post-verdict motion).

Clack's allegations also go well beyond permissible advocacy. In *Bond v. State*, appellate counsel exceeded the bounds of zealous advocacy and the parameters of Rule 3.01 of the Texas Disciplinary Rules of Professional Conduct when he characterized the trial court, without justification, as "despotic," "erratic," and "irrational." *Bond v. State*, 176 S.W.3d 397, 401 & n.3 (Tex. App.—Houston [1st Dist.] 2004, no pet.). The *Bond* court found that counsel had misrepresented the facts, distorted the record, and falsely accused the trial court of highly unprofessional and unethical conduct. *Id.* And, if such conduct is offensive and unethical, then Clack's conduct—in maligning the integrity of Judge Rucker and McClure, claiming, without any evidentiary basis, that Judge Rucker "tricked" her

22

and that he "colluded" with McClure—is similarly offensive, impermissible, and sanctionable.

Judge Hatch, as the factfinder, weighed the evidence and evaluated the witnesses' credibility, which he was free to believe or disbelieve. A trial court does not abuse its discretion when it chooses between conflicting pieces of evidence. *Keever*, 988 S.W.2d at 313–14. Judge Hatch found that Clack's allegations were not borne out of reasonable investigation and lacked evidentiary support; that fact, coupled with Clack's inaction, implied a dishonest and improper motive, namely to intimidate Judge Rucker and malign him and McClure. Judge Hatch found this conduct violated Rule 13 and imposed sanctions. After reviewing the evidence, we hold that there was some evidence of substantive and probative character for imposing sanctions, and we cannot conclude that the trial court's finding of bad faith was an abuse of discretion. We must now ensure that the sanctions imposed were appropriate and just. *See Am. Flood Research*, 192 S.W.3d at 583.

*C. Whether the Sanctions Imposed Were Appropriate and Just*

A trial court abuses its discretion if it imposes sanctions that are not appropriate and just. *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991). To be appropriate and just, there must be a direct nexus between the offensive conduct and the sanction imposed, and the sanction must not be excessive. *Id.*; *State Office of Risk Mgmt.*, 279 S.W.3d at 830.

The sanction imposed upon Clack required her to pay $17,670 to McClure to reimburse him, in part, for the attorney's fees and costs incurred in prosecuting his motion for sanctions. Clack contends that the sanctions order fails the appropriateness requirement because it was excessive.

Rule 13 authorizes sanctions as are available under Rule 215.2(b), which includes attorney's fees. *See* TEX. R. CIV. P. 13, 215.2(b). Sanctions awarded as

attorney's fees fall within the sound discretion of the trial court, and other courts of appeals in Texas have held that proof of the reasonableness and necessity of attorney's fees is not required when the fees are assessed as sanctions. *Olibas v. Gomez*, 242 S.W.3d 527, 535 (Tex. App.—El Paso 2007, pet. denied); *Glass v. Glass*, 826 S.W.2d 683, 688 (Tex. App.—Texarkana 1992, writ denied) (citing *Brantley v. Etter*, 677 S.W.2d 503, 504 (Tex. 1984)).

In his order on motion for sanctions, Judge Hatch found there was a direct relationship between the sanction imposed and the offensive conduct because the attorney's fees awarded to Wollschlager were incurred by him because of Clack's allegations of trickery and collusion. Judge Hatch found that the sanction was not excessive because Clack was ordered to pay a portion of Wollschlager's fees and costs, which Judge Hatch found to be reasonable and necessary, for the filing and prosecution of the motion for sanctions.

We find no abuse of discretion in Judge Hatch's findings. Given that the award was limited to a portion of the attorney's fees incurred as a result of Wollschlager's prosecution of the motion for sanctions, there was a direct nexus between the sanction imposed and the offensive conduct. Moreover, Clack has failed to demonstrate that the award was excessive. Before arriving at the sanction amount, Judge Hatch heard McClure testify that he charged $300 per hour and spent sixty-two and one-half hours on the motion for sanctions and the hearing. The sixty-two and one-half hours included travel between El Paso and Midland, trial preparation, review of the testimony, and preparation of pleadings. McClure also had two paralegals work on the case for thirty-eight hours at a rate of $90 per hour. Donaldson testified that her rate was $350 an hour; she had been practicing law for less than nine years, while McClure had been licensed since 1971.

Clack makes the argument that McClure and his staff spent an excessive amount of time preparing and hearing the motion for sanctions, which is a

reasonableness and necessity argument. In *Glass*, the Sixth Court of Appeals upheld a sanction without any evidence of reasonableness and necessity of attorney's fees, while the Second Court of Appeals, in *Stites*, upheld an award for attorney's fees that was less than the amount incurred. *Stites*, 872 S.W.2d at 796–97; *Glass*, 826 S.W.2d at 688. The total cost of the attorney's fees for McClure was $18,750, while the cost for his paralegal's work was $3,420, for a total of $22,170. At the end of the sanctions hearing, the court awarded $17,670 as a sanction against Clack and Donaldson. The sanctions imposed by Judge Hatch were in an amount less than the total of attorney's fees and costs due to McClure in connection with the sanctions proceedings.

In light of the testimony of Donaldson's rate and the testimony of McClure and the award by the trial court of less than the amount of attorney's fees and costs charged by McClure, and given the lack of any contrary evidence, we cannot hold that the amount awarded as sanctions was excessive. *See Werley v. Cannon*, 344 S.W.3d 527, 534–35 (Tex. App.—El Paso 2011, no pet.) (upholding sanctions order for attorney's fees based on testimony of trial counsel). We conclude that the sanctions against Clack were appropriate and just and that Judge Hatch did not abuse his discretion when he entered the sanctions order. We overrule Clack's sole issue on appeal.

## V. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

May 15, 2014                         JUSTICE

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.